FILED

Jun 21 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/jenniferv        DEPUTY

Anton Ewing (*not an attorney*)
3077 Clairemont Drive #372
San Diego, CA 92117
anton@antonewing.com.
(619)719-9640

Plaintiff in propria persona

# THE UNITED STATES FEDERAL DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

Anton Ewing, an individual,

           Plaintiff,

    vs.

Direct Merchant Funding, Inc., a New
York Corporation;
Direct Merchant Funding Group, LLC,
a Florida limited liability company;

         Defendants.

Civil Case No.:  '19CV1172 CAB BGS

**COMPLAINT**

**TCPA 47 USC §227(b)(1)(A)**

**TCPA 47 USC §227(c)(5)**

Plaintiff Anton Ewing ("Plaintiff"), complains against Defendant Direct

Merchant Funding, Inc., a New York corporation ("DIRECT MERCHANT

FUNDING"), and Direct Merchant Funding Group, LLC, a Florida limited liability

company (DMF), (collectively, Direct Merchant Funding and DMF are referred to as "Defendants" herein), and alleges as follows:

## I.      INTRODUCTION

1.      Plaintiff is not an attorney.  Plaintiff is not a lawyer.  Plaintiff is not a member of any State Bar.  See attached order from 18-cv-1455-LAB from the Honorable Chief Judge Larry A. Burns.

2.      In 2018, John DiCanio was the CEO of First Premier Funding, LLC, which this Plaintiff sued and obtained a default against in 18-cv-01063 AJB.  Then he set up DMF from Florida and Direct Merchant Funding, Inc from New York and called Plaintiff in 2019.

3.      Then DMF called again, and again and again.

4.      Nick Gallo is an employee of Direct Merchants Funding, Inc.

5.      Nick Gallo is an employee of DMF.

6.      Nick Gallo called, on behalf of and at the direction of Defendants, Plaintiff Ewing's DNC registered cellular phone (619-719-9640) on June 20, 2019, from his illegally spoofed phone number of 619-310-0069.

7.      Plaintiff was called by Defendants on June 20, 2019, six times.

8.      Nick Gollo, on behalf of Defendants, called Plaintiff on June 20, 2019 from 631-636-3976, from 877-386-3464, and from 619-310-0069.

9.      Consent to be called for solicitation purposes is an affirmative defense that

Defendants must prove.

10.   Plaintiff does not have to prove an absence of consent to being called.

11.   Defendant Direct Merchant Funding Group, LLC, a Florida LLC was formed on May 16, 2019 with address of 3154 Loomis Drive, New Port Richey, FL 34655 and John DiCanio is the manager.  DiCanio sent Plaintiff an email on 6/20/2019.

12.   Each Defendants violation of the TCPA is knowing and willful.

13.   Plaintiff did not ask to be called by a robo-dialer with a pre-recorded voice from each Defendant.

14.   The bubble popping sound at the beginning of Defendant's call signified and clearly establishes that an autodialer or ATDS was used.

15.   Plaintiff did not provide "express written consent" to be called for marketing and solicitation with an ATDS or autodialer.

16.   The phone number used by Defendant, 619-310-0069 is a spoofed number and is not a real telephone number belonging to any person.  It is illegal to spoof a phone number.

17.   47 USC §501 is a criminal statute.

18.   Plaintiff has never been to www.directmerchantfunding.com at any time relevant to this action.

19.   Plaintiff's ISP will prove that Plaintiff has, at all times relevant to this

action, never been to Defendant's web page www.directmerchantfunding.com.

20.    On June 20, 2019, Nick Gallo admitted on the telephone that he used an automatic telephone dialing system on his computer to dial Plaintiff's cell phone, 619-719-9640, from his phone number 619-310-0069.  However, before that call, there was a distinct bubble popping sound at the very beginning of the first call from what sounded like a call center in Bangladesh.  Nick Gallo knew Plaintiff's name.  Nick Gallo said he used "special software" to provide cash advances.  Nick Gallo admitted that he was recording the call at the end and not at the beginning.

21.    Call recording disclosure, unless exempted by CA Penal Code §633.5 for a PC §653m violation, otherwise requires disclosure of the fact of recording at the beginning of the call.

22.    A call to a cellular phone does not required personal confidential information to be exchanged in order to afford protection from illegal recording.

23.    Nick Gallo sent an email to Plaintiff from jgallo@directmerchatnfunding.com.   Nick Gallo stated his direct phone was 631-201-0703.

24.    Local Rule 83.4 regarding civility and its prohibition against attorneys making derogatory statements about Plaintiff that disparages the intelligence, ethics, morals, integrity or behavior of Plaintiff Ewing, applies to Defendant's attorney.

25.     Local Rule 83.4 can be found at:

https://www.casd.uscourts.gov/_assets/pdf/rules/Local%20Rules.pdf

26.     Defendant's attorney has read Local Rule 83.4 and agrees to not harass, intimidate, or disparage Ewing.

27.     Defendant's attorney is subject to and bound by California Business & Professions Code section 6128 regarding criminal deceit by an attorney.

28.     Defendant's attorney agrees to not commit criminal deceit in his dealings with Plaintiff.

29.     If Defendant's attorney makes any derogatory remarks in his pleadings toward Plaintiff, then Plaintiff will file a State Bar complaint, move for Rule 11 sanctions and will ask the Court to refer said attorney to the Federal Bar standing committee on discipline.  See General Order 708 adopted 4/12/2019

30.     DIRECT MERCHANT FUNDING began harassing Plaintiff on or about June 20, 2019.  Plaintiff was stern with Defendant back on June 20, 2019 and was very clear about never telemarketing him ever again.  Since Defendants did not cease and desist, this lawsuit resulted.

31.     After the June 20, 2019 call, Plaintiff received an email from Nick Gallo using the directmerchantfunding.com domain.

32.     The June 20, 2019 calls were not the first calls.  Plaintiff knows this because of what the employee on the other end of the phone was stating.  Defendant's

statements showed that Defendant DMF must have called prior, or must have paid and hired and controlled some other contracted agent of theirs to call Plaintiff previously. When Nick Gallo called, he stated Plaintiff's name (or rather the name that Plaintiff gives to telemarketers when they call) and Plaintiff's FICO score and email address.

33.     Often telemarketers higher controlled third parties to do their initial illegal calling in violation of the TCPA. The initial lead source always plays coy and will not divulge who they are or who they are working for. That in and of itself is a violation of the FCC's Telemarketing Sales Rule and actionable under 47 USC §227(c)(5). The only way that Plaintiff can find out who the TCPA violator is, is to fain interest and "play along" on the call as the telemarketer reads the script and illegally records the responses so they can sell the lead to Defendant Direct Merchant Funding.

34.     The volume of illegal telemarketing calls in this country is skyrocketing. Something must be done. Plaintiff is doing something about it.

35.     The Honorable District Judge Chad F. Kenney stated on May 1, 2019 in case number 18-cv-02071, *Shelton vs. Fast Advance Funding, LLC*: "Well, the only way this, this act is going to get any teeth in it at all is through a serial litigant."

36.     Judge Kenney was referring to the TCPA when he made this above statement on the record. See attached.

37.     Defendant directly called Plaintiff on his DNC registered cell phone in violation of the TCPA.

38.     The TCPA causes of action (47 USC §227(b) and (c)) filed herein for, *inter alia*, illegal telemarketing to Plaintiff's DNC registered cellular phone through the use of an ATDS is expressly alleged against Defendant Direct Merchant Funding, Inc.

39.     Direct Merchant Funding, Inc. has been illegally calling Mr. Ewing, without his consent, with autodialed and prerecorded calls ("robocalls") as well as "live-transfer" calls using an ATDS.  Mr. Ewing brings this action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), in hopes that an injunction and damages will encourage Direct Merchant Funding, Inc., to change their ways. To be clear, Plaintiff is suing Direct Merchant Funding for the directly dialed calls. There were other calls through lead generators but this lawsuit is for the direct autodialed calls as well.

40.     The Defendants will hand over the lead source in discovery.

41.     Defendant Direct Merchant Funding, Inc. paid Nick Gallo to make the above stated illegal calls to Plaintiff.

## II. PARTIES

42.     Plaintiff Anton Ewing is a citizen of California who resides in California, in this District.  Plaintiff is a person as defined by the TCPA.

43.     Defendant Direct Merchant Funding, Inc., is an Illinois limited liability company with its corporate office in New York, and is NOT lawfully registered to do business in California.

44.     Direct Merchant Funding is not licensed to telemarket in CA with the CA DOJ, did not pay its required $50 fee or post the required $100,000 bond, no it is licensed to sell, make or broker loans because it does not have a CFL license.

45.     Nick Gallo called Plaintiff through an auto dialing system without permission.

46.     Nick Gallo did not have permission or consent to call or text Plaintiff.

### III. JURISDICTION AND VENUE

47.     This Court has federal-question subject matter jurisdiction over the Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

48.     This Court has personal jurisdiction over Direct Merchant Funding, Inc. because a substantial part of the wrongful acts alleged in this Complaint were committed in California. For example, Direct Merchant Funding, Inc. made illegal telemarketing robocalls to Mr. Ewing, while he was in California.   Direct Merchant Funding, Inc. has also subjected themselves to personal jurisdiction in California because they are running and abetting said criminal operation.  It is a crime to violate 47 USC §501 by violating 47 USC §227(b).  Direct Merchant

Funding, Inc. through their dba's and agents, initiated the primary telemarketing calls to Plaintiff and then sold, transferred and provided the lead to Direct Merchant Funding, Inc. marketers and others within the organization in a knowingly illegal manner.

49.     Plaintiff was called on cell phone of 619-719-9640 by Direct Merchant Funding, Inc.   Plaintiff was called multiple times beginning on or about June 20, 2019, from 619-310-0069, a number owned, used and controlled by Direct Merchant Funding, Inc. and its agents, with a prerecorded message which then transferred to a live human.  The initial part of the call was a pre-recorded message.  After many personal questions were asked and answered, the call was transferred to another Direct Merchant Funding, Inc. person who repeated the same questions.   Defendant's employee asked if Plaintiff was interested in merchant cash advances or business loans.

50.     Plaintiff has expressly stated exactly what phone number Defendant used to call Plaintiff, as well as an exact date of one of the calls, to which number the calls were made, what was said on the call and that the call was made with an ATDS and prerecorded message.  All of this meets the particularity requirements for a cause of action.

51.     Plaintiff's phone number is not a business phone.

52.     Plaintiff's phone is registered on www.donotcall.gov and was done so more

than 31 days prior to the first call.

## IV. TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

53.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

54.     The TCPA makes it unlawful to make telemarketing solicitations to telephone numbers on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

55.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c). 47 U.S.C. § 227(c)(5).

56.     Plaintiff Ewing alleges that Defendant Direct Merchant Funding, Inc. placed repeated automated telephone calls to Plaintiff Ewing's cell phone (619-719-9640) from their phones and that the calls exhibited signs of being made with an Automated Telephone Dialing System, including repeated telemarketing calls to Plaintiff Ewing within a period of time from January 2018 to June 20, 2019 and the presence of a pause or click (which is proven by the recording), which is commonly associated with an Automated Telephone Dialing System (ATDS). Those allegations are true and are sufficient to establish the elements of a TCPA claim.  There was a long delay when the calls connected every time and Plaintiff heard a bubble popping sound right before the prerecorded message started.

# V. STANDING

57.     The court must evaluate lack of statutory standing under the Rule 12(b)(6) standard. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  However, because Plaintiff is proceeding pro se, his complaint "must be held to less stringent standards than formal pleadings drafted by lawyers" and must be "liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (reaffirming standard for pro se complaints post-*Twombly*). The Ninth Circuit has concluded that the court's treatment of pro se filings after *Twombly* and *Iqbal* remain the same and *pro se* pleadings must continue to be liberally construed. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010); see also *McGowan v. Hulick*, 612 F.3d 636, 640-42 (7th Cir. 2010); *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461-62 (5th Cir. 2010); *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (noting that even following *Twombly* and *Iqbal*, "we remain obligated to construe a pro se complaint liberally").

58.     Standing is proper under Article III of the Constitution of the United States of America because Plaintiff's claims state:

    A. A valid injury in fact;

    B. which is traceable to the conduct of Defendant;

    C. and is likely to be redressed by a favorable judicial decision.  See,

        *Spokeo, Inc. v. Robins*, 578 U.S.____(2016) at 6, and *Lujan v. Defenders*

*of WildLife*, 504 U.S. 555 at 560.  In order to meet the standard laid out in

*Spokeo* and *Lujan*, Plaintiffs must clearly allege facts demonstrating all

three prongs above.

**The "Injury in Fact" Prong**

59.   Plaintiff's injury in fact, must be both "concrete" and "particularized" in

order to satisfy the requirements of Article III of the Constitution, as laid out in

*Spokeo (*Id.). For an injury to be "concrete," it must be a de facto injury, meaning

that it actually exists.  In the present case, Plaintiff was called on his cellular phone

at least five times by Defendants.  In fact, Plaintiff expressly informed Defendants

to cease and desist from all future telemarketing on the very first call.  Such calls

are a nuisance, an invasion of privacy, and an expense to Plaintiff in multiple ways.

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012).

Defendant's invasion of Plaintiff's right to privacy is further exacerbated by the

fact that Plaintiff's phone number, at all times relevant to this litigation, was on the

National Do-Not-Call Registry ( hereinafter, "DNC Registry").  As well, Plaintiff

had no prior business relationship with Defendant prior to receiving the seriously

harassing and annoying calls by Direct Merchant Funding, Inc.   All of Plaintiff's

injuries are concrete and de facto. For an injury to be "particularized" means that

the injury must "affect the plaintiff in a personal and individual way." *Spokeo, Inc.*

*v. Robins,* 135 S.Ct. 1540, *578 U.S. ___ (2016)* at 14.  In the instant case, it was

Plaintiff's phone that was called and it was Plaintiff who answered the calls.  It was Plaintiff's personal privacy and peace that was invaded by Defendant's persistent phone calls using an ATDS and a pre-recoded message, despite Plaintiff having no prior business relationship with Defendant and Plaintiff's attempt to avoid the damage by registering his number on the DNC Registry.

**The "Traceable to the Conduct of Defendant" Prong**

60.     The second prong required to establish standing at the pleadings phase is that Plaintiff must allege facts to show that their injury is traceable to the conduct of Defendant. In the instant case, this prong is met by the fact that the calls to Plaintiff's cellular phone and home phone (land line) were placed either by Defendant directly, or by Defendant's agent at the express direction and control of Defendant.   See *Jones v. Royal Admin. Servs., 866 F.3d 1100 (9th Cir. 2017)* ten factor test from the 9th Circuit and Civil code §2307.

**The "Injury is Likely to be Redressed by a Favorable Judicial Opinion" Prong**

61.     The third prong to establish standing at the pleadings phase requires Plaintiff to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion. In the present case, Plaintiff's Prayers for Relief includes a request for damages for each call made by Defendant, as authorized by statute in 47 U.S.C. § 227. The statutory damages were set by Congress and specifically

redress the financial damages suffered by Plaintiff. Furthermore, Plaintiff's

Prayers for Relief request injunctive relief to restrain Defendant from the alleged

abusive practices in the future. The award of monetary damages and the order for

injunctive relief redress the injuries of the past and prevent further injury in the

future. Because all standing requirements of Article III of the U.S. Constitution

have been met, as laid out in *Spokeo, Inc. v. Robins*, 578 U.S. ___ (2016), Plaintiff

has standing to sue Defendant on the stated claims.

62.     "…[C]ourts in the Ninth Circuit have held that "allegations of nuisance and

invasions of privacy in TCPA actions are concrete" injuries that establish standing.

See *Mbazomo v. ETourandtravel, Inc.*, 16-CV-2229-SB, 2016 U.S. Dist. LEXIS

170186, 2016 WL 7165693, at *2 (E.D. Cal. Dec. 8, 2016). In *Mbazamo*, the court

held that a violation of the TCPA represents a concrete injury because "[t]he

history of sustaining claims against both unwelcome intrusion into a plaintiff's

seclusion and unceasing debt-collector harassment are squarely 'harm[s] that [have]

traditionally been regarded as providing a basis for a lawsuit.'" *Mbazomo*, 2016

U.S. Dist. LEXIS 170186, 2016 WL 7165693, at *2 (quoting *Spokeo*, 136 S.Ct. at

1549-50). The court declined to follow Romero, explaining that Romero

"improperly erodes the pleading standard set under Fed. R. Civ. P. 8(a) . . . . A

plaintiff [need only] plausibly tie the alleged acts of the defendant to the alleged

harms suffered." Id. *Messerlian v. Rentokil N. Am., Inc.* (C.D.Cal. Dec. 15, 2016, No. CV 16-6941-GW (GJSx)) 2016 U.S.Dist.LEXIS 175224, at *7-8.

63.     "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*. at 1548 (quoting *Lujan*, 504 U.S. at 560).  The Supreme Court noted that concreteness is quite distinct from particularization. *Id.* An injury is "particularized" if it affects "the plaintiff in a personal and individual way." *Id.* In addition, for an injury to be "concrete", it must be "de facto," meaning that it is "real" and not "abstract." *Id.* However, an injury need not be "tangible" in order to be "concrete," and intangible injuries may constitute injury in fact. *Id.* at 1549. In order to determine whether an intangible harm constitutes injury in fact, *Spokeo* provided two factors to be considered: "history and the judgment of Congress." *Id.* at 1549. Specifically, "(1) whether the statutory violation bears a 'close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts,' and (2) congressional judgment in establishing the statutory right, including whether the statutory right is substantive or procedural." *Matera v. Google*, No. 15cv 4062-LHK, 2016 WL 5339806, at *9 (N.D. Cal. Sept. 23, 2016). *Spokeo* also held that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." *Spokeo*, 136 S. Ct. at

1549.  In such a case, a plaintiff "need not allege any additional harm beyond the one [the legislature] has identified." *Id.*

64.     Here, Plaintiff alleges that Defendant Direct Merchant Funding, Inc. contacted him using a "telephone dialing system."  This is insufficient standing alone, but as in *Charkchyan* and *Kramer*, Plaintiff alleges sufficient additional facts. First, each of the calls are available to the Court as audio recordings of the robotic voice message that initiated the calls. Second, the calls are impersonal advertisements: they do not address Plaintiff personally and they advertise Defendant JS Holding's product. Third, Plaintiff declares that he has never heard of Defendant Direct Merchant Funding, visited any location operated by said Defendant prior to the harassing and annoying calls, nor provided his cellular telephone numbers to said Defendant or consented to receive calls from Defendant. Plaintiff also has had no prior business relationship with Defendant.  Plaintiff had no reason to be in contact with Defendant Direct Merchant Funding nor has he ever purchased any kind of product or service. Plaintiff's allegations are sufficient to establish that Defendant used ATDS in sending their prerecorded solicitation messages.  Plaintiff does not own video or drone business and therefore could not possibly purchase loan services from Defendants.

65.     In Plaintiff's case, the allegations establish that he did not give prior express consent.  He declared that he was "the regular user and subscriber to the cellular

telephone number at issue." He also declared that he has "never heard of [Defendant], visited any location operated by [Defendant], provided [his] cellular telephone number to [Defendant] or consented to receive text messages from [Defendant]." As in *Charkchyan*, these allegations are sufficient to support Plaintiff's claims that he did not give prior express consent authorizing Defendant to send the prerecorded messages.

## VI. FACTUAL ALLEGATIONS

### A. Direct Merchant Funding, Inc.

66.    One of Direct Merchant Funding, Inc.'s strategies for marketing its services is placing telemarketing robocalls to those who have not consented to receive such solicitations, including Plaintiff.

67.    Direct Merchant Funding, Inc. uses equipment that has the capacity to store or produce random or sequential telephone numbers to be called and that includes autodialers and predictive dialers (each an "automatic telephone dialing system" or "ATDS").

68.    Direct Merchant Funding, Inc. sent Plaintiff an email containing a link to an application.

### B. Plaintiff

69.    Plaintiff Anton Ewing is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

**C.  Telephone number** 619-719-9640

70.    A phone number beginning 619-719-9640 is registered to Mr. Ewing.

71.    619-719-9640 is on the National Do Not Call Registry.

72.    Mr. Ewing answers calls made to 619-719-9640.

73.    Mr. Ewing pays the phone bills for 619-719-9640.

## VII. FIRST CLAIM FOR RELIEF

**(Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))**

74.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

75.    Defendants are using DMF and Direct Merchant Funding Inc interchangeably and there is no real legal distinction between the two entities. They are a shame.

76.    The foregoing acts and omissions of Direct Merchant Funding, Inc. and/or its affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing robocalls to the cellular telephone number of Plaintiff without prior express written consent.

77.    The defendant in this matter is vicariously liable for the acts and actions of the lead source under the *Gomez* case from the US Supreme Court handed down on January 20, 2016.  Discovery will reveal the name of the lead agent.  Direct

Merchant Funding, Inc. controlled the lead agent and had actual knowledge of the TCPA violations.

78.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

79.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

80.    Plaintiff also seeks a permanent injunction prohibiting Direct Merchant Funding, Inc. and its affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without prior express written consent of the called party.

## VIII. SECOND CLAIM FOR RELIEF

### (Non-Emergency Robocalls to Telephones, 47 U.S.C. § 227(b)(1)(B))

81.    Mr. Ewing realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

82.    The foregoing acts and omissions of Direct Merchant Funding, Inc. and/or its affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(B), by making non-emergency prerecorded telemarketing calls to the personal telephone 619-719-9640 number of Mr. Ewing without prior express written consent.

83.     Mr. Ewing is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

84.     Mr. Ewing is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

85.     Mr. Ewing also seeks a permanent injunction prohibiting DIRECT MERCHANT FUNDING, INC., and its affiliates and agents from making non-emergency prerecorded telemarketing calls to residential telephone numbers without prior express written consent of the called party.

## IX. THIRD CLAIM FOR RELIEF

**(Telemarketing Solicitations to National Do Not Call Registrants, 47 U.S.C. § 227(c))**

86.     Plaintiff realleges and incorporate by reference each and every allegation set forth in the preceding paragraphs.

87.     The foregoing acts and omissions of Direct Merchant Funding, Inc. and/or its affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(c), by making telemarketing solicitations to residential and wireless telephone numbers listed on the Federal Government's National Do Not Call Registry. 47 C.F.R. §64.1200(c)(2).

88.     Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

89.     Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

90.     Plaintiff also seeks a permanent injunction prohibiting Direct Merchant Funding, Inc. and its affiliates and agents from making telemarketing solicitations to residential and wireless telephone numbers listed on the Federal Government's National Do Not Call Registry.

## X. EXHIBITS

91.     Exhibit A is a true and accurate copy of an email to Plaintiff from Defendant's employee.

92.     Exhibit B is a true and accurate copy of Direct Merchant Funding, Inc., company details.

93.     Exhibit C is a true and accurate copy of the Defendant's loan application.

94.     Exhibit D is a true and accurate copy of LexisNexis excerpt from the Gomez and Crunch case.

95.     Exhibit E is a true and accurate copy of Civil Case No. 2:18-cv-02071, James Everett Shelton v. Fast Advance Funding, LLC.

96.     Exhibit F is a true and accurate copy of Plaintiff's AT&T telephone log.

97.     Exhibit G is a true and accurate copy of "Findings and Admonition to Plaintiff" by the Honorable Chief Judge Larry A. Burns dated 5/30/2019.

# XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for this Honorable Court to enter judgment against all Defendant as follows:

A. Leave to amend this Complaint to conform to the evidence presented at trial;

B. A declaration that actions complained of herein by DIRECT MERCHANT FUNDING, INC. violate the TCPA;

C. $500 plus threefold damages for intentional or willful violation of the Do-Not-Call Registry for each and every call;

D. For an injunction prohibiting all Defendant from ever contacting Plaintiff ever again in any manner whatsoever, including spam texting, robodialing, and spam emailing;

E. $1,500 for each violation of 16 CFR §610.4(b)(iii)(B) initiating a call to a DNC registered number;

F. $1,500 for each violation of 47 CFR §64.1601(3) caller ID spoofing;

G. $1,500 for each violation of 47 CFR §64.1200(d)(1) failure to provide copy of written do not call policy;

H. $1,500 for each violation of 47 CFR §64.1200(b)(1) failure to state name of business at beginning of call;

I. $1,500 for each violation of 47 USC §227(b)(1)(A)(iii) willful or knowing call to cellular phone;

J.  $1,500 for each violation of 47 USC §227(b)(1) for using an ATDS;

K.  $1,500 for each violation of 47 USC §227(c) and (d) for calling a phone

number on the DNC registry; and

L.  For any other relief that the Court deems just and proper.

## XII. DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

Dated:  June 21, 2019

_____

Anton Ewing,
Plaintiff

# Exhibit A

 Gmail

**Doe John <sddronevideos@gmail.com>**

## RE: As per our conversation
7 messages

**ngallo@directmerchantfunding.com** <ngallo@directmerchantfunding.com>    Thu, Jun 20, 2019 at 11:12 AM
To: sddronevideos@gmail.com





### Dear Anthony Stark,

It was a pleasure speaking with you. Please click on our secure link where you can fill out our online application as well as upload 3 months of your current bank statements.

### Please click link below to get started:
Click here

Direct Merchant Funding is dedicated to getting our clients the right working capital solutions for their business. We offer a multitude of commercial finance options through our marketplace including but not limited to:

| Business Funding | Asset-based lending |
|---|---|
| Factoring | Trade Finance |

- One-page application (attached below) or click above and submit online
- 3 months of your most recent business bank statements

and one of our senior fund managers will contact you within 24 hours to discuss:

- What types of working capital are available to your company
- The approximate cost of the financing
- How long it will take to receive the funding

Regards,

Nick Gallo

Direct Merchant Funding

Office: (877) 386-3464

Extension #: 4018

Cell : (631) 636-3976 Fax: -

Email: ngallo@directmerchantfunding.com



www.directmerchantfunding.com

290 broadhollow rd Melville, NY 11747

**NOTICE:** This electronic transmission and any attachment are the confidential property of the sender, and the materials are privileged communications intended solely for the receipt, use, benefit, and information of the intended recipient indicated above. If you are not the intended recipient, you are hereby notified that any review,

disclosure, copying, distribution, or the taking of any action in reliance on the contents of this electronic transmission is strictly prohibited, and may result in legal liability on your part. If you have received this email in error, please forward back to sender and destroy the electronic transmission.

---

 **SD Drones Videos**
43K

---

**SD Drone Videos** <sddronevideos@gmail.com>                Thu, Jun 20, 2019 at 1:04 PM
To: ngallo@directmerchantfunding.com

DIRECT MERCHANT FUNDING INC.
290 BROADHOLLOW ROAD
SUITE 220 EAST
MELVILLE, NEW YORK, 11747

Is this your company?

[Quoted text hidden]

---

**Nick Gallo** <ngallo@directmerchantfunding.com>           Thu, Jun 20, 2019 at 1:07 PM
To: SD Drone Videos <sddronevideos@gmail.com>

yes. its Nick
[Quoted text hidden]

---

**SD Drone Videos** <sddronevideos@gmail.com>                Thu, Jun 20, 2019 at 1:26 PM
To: Nick Gallo <ngallo@directmerchantfunding.com>

Nick, you know my FICO score (710) and my email address.  Did we speak previously?

[Quoted text hidden]

---

**Nick Gallo** <ngallo@directmerchantfunding.com>           Thu, Jun 20, 2019 at 1:29 PM
To: SD Drone Videos <sddronevideos@gmail.com>

we spoke earlier. I was person who told you that 90% of people calling you that do what we do are not gonna be able to do what they promise

On Thu, Jun 20, 2019 at 4:03 PM SD Drone Videos <sddronevideos@gmail.com> wrote:
[Quoted text hidden]

---

**SD Drone Videos** <sddronevideos@gmail.com>                Thu, Jun 20, 2019 at 1:40 PM
To: Nick Gallo <ngallo@directmerchantfunding.com>

# Exhibit B

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through June 19, 2019.

Selected Entity Name: DIRECT MERCHANT FUNDING INC.
Selected Entity Status Information

**Current Entity Name:** DIRECT MERCHANT FUNDING INC.

**DOS ID #:** 5567936

**Initial DOS Filing Date:** JUNE 10, 2019

**County:** SUFFOLK

**Jurisdiction:** NEW YORK

**Entity Type:** DOMESTIC BUSINESS CORPORATION

**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

DIRECT MERCHANT FUNDING INC.
290 BROADHOLLOW ROAD
SUITE 220 EAST
MELVILLE, NEW YORK, 11747

**Registered Agent**

NONE

# Detail by Entity Name

Florida Limited Liability Company
DIRECT MERCHANT FUNDING GROUP, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L19000132980 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 05/16/2019 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

3154 LOOMIS DR
NEW PORT RICHEY, FL 34655

**Mailing Address**

3154 LOOMIS DR
NEW PORT RICHEY, FL 34655

**Registered Agent Name & Address**

REGISTERED AGENTS INC.
7901 4TH ST N STE 300
ST. PETERSBURG, FL 33702

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

DICANIO, JOHN
3154 LOOMIS DR
NEW PORT RICHEY, FL 34655

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

05/16/2019 -- Florida Limited Liability    View image in PDF format

# Exhibit C

# DIRECT
## MERCHANT FUNDING GROUP
**Working Capital Application**
**290 broadhollow rd Melville, NY 11747**
**www.directmerchantfunding.com**

| **Underwriter:** Nick Gallo |
| **Phone #:** (631) 636-3976 |
| **Fax #:** - |
| **Email:** ngallo@directmerchantfunding.com |

### BUSINESS INFORMATION

| **Legal/Corporate Name:** SD Drones Videos | | **DBA:** | | |
|---|---|---|---|---|
| **Physical Address:** | | **City:** | **State:** | **Zip:** |
| **Telephone #:** (619) 719-9640 | **Fax #:** | | **Federal Tax ID:** | |
| **Date Business Started:** | **Length of Ownership:** | | **Website:** | |
| **Type of Entity (circle one):** Sole Proprietorship  Partnership  Corporation  LLC  Other | | | **Email Address:** sddronevideos@gmail.com | |
| **Type of Business :** | | | **Product/Service Sold:** | |
| **Use of Proceeds:** | **Requested Amount:** | | **Gross Annual Sales:** | |

### OWNER/OFFICER INFORMATION

| **Owner First Name:** Anthony | **Owner Last Name:** Stark | **Ownership %:** | **Credit Score:** |
|---|---|---|---|
| **Home Address:** | **City:** | **State:** | **Zip:** |
| **SSN:** | **Date of Birth:** | **Home #:** | **Cell #:** |

### PARTNER INFORMATION (If owner/officer ownership % less than 50%)

| **Partner First Name:** | **Partner Last Name:** | **Ownership %:** | **Credit Score:** |
|---|---|---|---|
| **Home Address:** | **City:** | **State:** | **Zip:** |
| **SSN:** | **Date of Birth:** | **Home #:** | **Cell #:** |

### BUSINESS PROPERTY INFORMATION

| **Business Landlord or Business Mortgage Bank:** | **Contact Name and/or Account #:** | **Phone #:** |
|---|---|---|
| **Own/Lease: (circle one):** | **Monthly Rent or Mortgage:** | |

### CREDIT CARD INFORMATION

| **Credit Card Processing Terminal(s)/Software Model:** | **Number of Terminals:** | **Average Monthly Volume:** |
|---|---|---|
| **State of Incorporation:** | **Do you Accept: Visa/MasterCard Amex Discover Debit EBT Please circle all that apply.** | |
| **Prior/Current Working Capital / Funding (if applicable):** | **Balance:** | **Underwriter Use Only** Split Funds __ ACH __ |

### BANK INFORMATION

| **Previous Month Business Deposits** | **2 Months Ago Business Deposits** | **3 Months Ago Business Deposits** | **4 Months Ago Business Deposits** |
|---|---|---|---|
| | | | |
| **Previous Month # Neg. Days** | **2 Months Ago # Neg. Days** | **3 Months Ago # Neg. Days** | **4 Months Ago # Neg. Days** |
| | | | |

By signing below, each of the above listed business and business owner/officer (individually and collectively, "Applicant") certify that the Applicant is an owner of the above named business and that all information provided in the application is true and accurate. Applicant shall immediately notify dba Direct Merchant Funding ("Direct Merchant Funding ") of any change in such information or financial condition. Applicant authorizes Direct Merchant Funding to share this application with each of its representatives, successors, assigns and designees ("Assignees") or any other parties that may be involved with the extension of credit pursuant to this application including those who offer commercial loans having daily repayment features or purchases of future receivables including Merchant Cash Advance transactions, including without limitation the application therefor (collectively, "Transactions ). Applicant further authorizes Direct Merchant Funding and all Assignees to request and receive any third party consumer or personal , business and investigative reports and other information about Applicant, including credit card processor statements and bank statements, from one or more consumer reporting agencies, such as TransUnion, Experian , and Equifax, and from other credit bureaus, banks, creditors and other third parties. Applicant authorizes Direct Merchant Funding to transmit this form, along with any other foregoing information obtained in connection with this application, to any or all of the Assignees for the foregoing purpose. You also consent to the release, by any creditor or financial institution , of any information relating to any of you , to Direct Merchant Funding and to each of the Assignees, on its own behalf. Applicant waives and releases any claims against Recipients and any information-providers arising from any act or omission relating to the requesting, receiving or release of the information obtained in connection with this application.

| Anthony Stark | Date | Applicant's Signature | Date |
|---|---|---|---|

# Exhibit D

*Sch. Dist., 228 F.3d 1003, 1017 (9th Cir. 2000)*, *cert. denied, 532 U.S. 994, 121 S. Ct. 1653, 149 L. Ed. 2d 636 (2001)*. For example, the *First Amendment* does not require the federal government to fund messages both for and against abortion. *Cf. Rust v. Sullivan, 500 U.S. 173, 203, 111 S. Ct. 1759, 114 L. Ed. 2d 233 (1991)* (upholding, under the government speech doctrine, regulations forbidding certain publicly funded doctors from endorsing abortion). Similarly, in this context, the doctrine would preclude Campbell-Ewald from demanding that the Navy create an advertising campaign that discourages military participation. The government speech doctrine is simply immaterial to the present dispute, in which the plaintiff is not advocating for viewpoint neutrality, but is instead challenging the regulation of a particular means of communication.

IV.

Campbell-Ewald nevertheless argues that it cannot be held liable for **TCPA** violations because it outsourced the dialing and did not actually make any calls on behalf of its client. *See 47 U.S.C. § 227(b)(1)(A)(iii)* (rendering it unlawful "to make any call" using an automated dialing system). **Gomez**, in fact, concedes that a third [**13] party transmitted the disputed messages. Even so, Campbell-Ewald's argument is not persuasive.

Although Campbell-Ewald did not send any text messages, it might be vicariously liable for the messages sent by Mindmatics. The statute itself is silent as to **vicarious liability**. We therefore assume that Congress intended to incorporate "ordinary tort-related **vicarious liability** rules." *Meyer v. Holley, 537 U.S. 280, 285, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003)*. Accordingly, **HN8** "[a]bsent a clear expression of Congressional intent to apply another standard, the Court must presume that Congress intended to apply the traditional standards of **vicarious liability** . . . ." *Thomas v. Taco Bell Corp., 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012)*, *aff'd, 582 F. App'x 678, 2014 U.S. App. LEXIS 12547, 2014 WL 2959160 (9th Cir. 2014)* (per curiam). Although we have never expressly reached this question, several of our district courts have already concluded that the **TCPA** imposes **vicarious liability** where an agency relationship, as defined by federal common law, is established between the defendant and a third-party caller.[5]

[*878] This interpretation is consistent with that of the statute's implementing agency, which has repeatedly acknowledged the existence of **vicarious liability** under the **TCPA**. **HN9** The Federal Communications Commission is expressly imbued with authority [**14] to "prescribe regulations to implement the requirements" of the **TCPA**. *47 U.S.C. § 227(b)(2)*. As early as 1995, the FCC stated that "[c]alls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call." *In re Rules and Regulations Implementing the TCPA* of 1991, 10 FCC Rcd. 12391, 12397 (1995). More recently, the FCC has clarified that **vicarious liability** is imposed "under federal common law principles of agency for violations of either *section 227(b)* or *section 227(c)* that are committed by third-party telemarketers." *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013). Because Congress has not spoken directly to this issue and because the FCC's interpretation was included in a fully adjudicated declaratory ruling, the interpretation must be afforded *Chevron* deference. *Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc., 423 F.3d 1056, 1065 (9th Cir. 2005)* (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980-85, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005)*) (other citations omitted), *aff'd, 550 U.S. 45, 127 S. Ct. 1513, 167 L. Ed. 2d 422 (2007)*; *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)* ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." (footnote omitted)).

Campbell-Ewald concedes that the FCC already recognizes **vicarious liability** in this context, but argues that **vicarious liability** only extends to the merchant whose goods or services are being promoted [**15] by the telemarketing campaign. Yet the statutory language suggests otherwise, as *§ 227(b)* simply imposes **liability** upon "any person"—not "any merchant." *See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 221, 128 S. Ct. 831, 169 L. Ed. 2d 680 (2008)* (interpreting the use of "any" as "all-encompassing"); *47 C.F.R. § 64.1200*

[5] *Ibid. See also Kristensen v. Credit Payment Servs., No. 2:12-CV-00528-APG, __ F. Supp. 2d __ , 12 F. Supp. 3d 1292, 2014 U.S. Dist. LEXIS 41696, 2014 WL 1256035 (D. Nev. Mar. 26, 2014); In re Jiffy Lube Int'l Inc., 847 F. Supp. 2d 1253 (S.D. Cal. 2012); Kramer v. Autobytel, Inc., 759 F. Supp. 2d 1165 (N.D. Cal. 2010).*

aside, suspend (in whole or in part), or to determine the validity of—(1) all final orders of the [FCC] made reviewable by [47 U.S.C § 402(a)]," 28 U.S.C. § 2342, so long as the appeal is timely, meaning that it was brought within sixty days from when the FCC releases the final order to the [*19] public, see 28 U.S.C. § 2344.[4] Here, various parties timely challenged the FCC's 2015 order in both the Seventh and D.C. Circuits; these challenges were consolidated and assigned to the D.C. Circuit, which then became "the sole forum for addressing . . . the validity of the FCC's" order. MCI Telecomms. Corp. v. U.S. W. Commc'ns, 204 F.3d 1262, 1267 (9th Cir. 2000) (quoting GTE South, Inc. v. Morrison, 199 F.3d 733, 743 (4th Cir. 1999)). Because the D.C. Circuit exercised its authority to set aside the FCC's interpretations of the definition of an ATDS in the 2015 order, 28 U.S.C. § 2342, and any prior FCC rules that were reinstated by the 2015 order, see Biggerstaff, 511 F.3d at 185 (quoting Pub. Citizen, 901 F.2d at 152), we conclude that the FCC's prior orders on that issue are no longer binding on us. See King v. Time Warner Cable Inc., 894 F.3d 473, 476-77 (2d Cir. 2018) (holding that HN3[⚓] ACA International "invalidated that [FCC 2015 Declaratory Ruling] and thereby removed any deference we might owe to the views the FCC expressed in it"); Dominguez ex rel Himself v. Yahoo, Inc., 894 F.3d 116, 119 (3d Cir. 2018) (holding that in light of the D.C. Circuit's holding, the court was free to interpret the statutory definition of an autodialer as it had prior to the issuance of the FCC's 2015 order).

HN4[⚓] We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party in order to determine whether there are any genuine issues of material fact. Thomas v. Ponder, 611 F.3d 1144, 1149-50 (9th Cir. 2010). The district court had jurisdiction [*20] under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

B

Because the D.C. Circuit vacated the FCC's interpretation of what sort of device qualified as an ATDS, only the statutory definition of ATDS as set forth by Congress in 1991 remains. See 47 U.S.C. § 227(a).[5] Accordingly, we must begin anew to consider the definition of ATDS under the TCPA.

HN5[⚓] We "begin [our analysis] with the plain language of the statute." Guido v. Mount Lemmon Fire Dist., 859 F.3d 1168, 1170 n.1 (9th Cir. 2017) (alteration in original) (quoting Negusie v. Holder, 555 U.S. 511, 542, 129 S. Ct. 1159, 173 L. Ed. 2d 20 (2009)). "If the 'statutory text is plain and unambiguous[,]' we 'must apply the statute according to its terms.'" Id. (alteration in original) (quoting Carcieri v. Salazar, 555 U.S. 379, 387, 129 S. Ct. 1058, 172 L. Ed. 2d 791 (2009)). If the language of a statute is ambiguous, "we may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." Ileto v. Glock, Inc., 565 F.3d 1126, 1133 (9th Cir. 2009) (quoting Jonah R. v. Carmona, 446 F.3d 1000, 1005 (9th Cir. 2006)). "It is also 'a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000) (quoting Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed. 2d 891 (1989)). "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S. Ct. 1811, 100 L. Ed. 2d 313 (1988); see also United States v. Lewis, 67 F.3d 225, 228-29 (9th Cir. 1995) ("Particular phrases must be construed in light of the overall purpose and [*21] structure of the whole statutory scheme.").

As the D.C. Circuit noted, the definition of ATDS "naturally raises two questions: (i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" ACA Int'l, 885 F.3d at 695. We start by addressing the second question regarding functions. HN6[⚓] The TCPA defines ATDS as "equipment which has the

---

[4] An appellate court lacks authority to consider a challenge to an FCC order that is brought after sixty days from the date when the FCC releases the final order to the public. See 28 U.S.C. § 2344; see also US West Communs., Inc. v. Jennings, 304 F.3d 950, 958 n.2 (9th Cir. 2002) (stating that "[p]roperly promulgated FCC regulations currently in effect must be presumed valid" for purposes of a case not brought pursuant to a petition under the Hobbs Act).

[5] Although the FCC had promulgated a regulation defining ATDS, the "regulation does little more than restate the terms of the statute itself," and "the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute. Gonzales v. Oregon, 546 U.S. 243, 257, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006).

capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *47 U.S.C. § 227(a)(1)*. The question is whether, in order to be an ATDS, a device must dial numbers generated by a random or sequential number generator or if a device can be an ATDS if it merely dials numbers from a stored list. We must also determine to what extent the device must function without human intervention in order to qualify as an ATDS.

Marks and *Crunch* offer competing interpretations of the language of *§ 227(a)(1)(A)*, but both parties fail to make sense of the statutory language without reading additional words into the statute.

Marks points out that a number generator is not a storage device; a device could not use "a random or sequential number generator" to store telephone numbers. Therefore, Marks **[*22]** asserts, it does not make sense to read "store" in *subdivision (A)* as applying to "telephone numbers to be called, using a random or sequential number generator." *47 U.S.C. § 227(a)(1)(A)*. Instead, Marks contends that we should read the definition as providing that an ATDS is "equipment which has the capacity (A) to [i] store [telephone numbers to be called] or [ii] produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." In other words, a piece of equipment qualifies as an ATDS if it has the capacity to store telephone numbers and then dial them.

*Crunch*, in turn, argues that due to the placement of the comma in the statute, the phrase "using a random or sequential number generator" modifies both "store" and "produce." Therefore, *Crunch* argues that the best reading of the statute defines an ATDS as "equipment which has the capacity (A) to store [telephone numbers produced using a random or sequential number generator]; or [to] produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." As such, to qualify as an ATDS, according to *Crunch*, a device must store telephone numbers that have been produced using **[*23]** a random or sequential number generator.

After struggling with the statutory language ourselves, we conclude that it is not susceptible to a straightforward interpretation based on the plain language alone. Rather, the statutory text is ambiguous

on its face.[6] The D.C. Circuit apparently agreed, stating that "[i]t might be permissible" for the FCC to adopt an interpretation that a device had to generate random or sequential numbers in order to be an ATDS, or that a device could be an ATDS if it was limited to dialing numbers from a stored list. *ACA Int'l, 885 F.3d at 702-03*. We therefore turn to other aids in statutory interpretation.

C

*HN7*[⬆] Because the statutory language is ambiguous, we look at the context and the structure of the statutory scheme. The structure and context of the *TCPA* as originally enacted indicate that Congress intended to regulate devices that make automatic calls. Although Congress focused on regulating the use of equipment that dialed blocks of sequential or randomly generated numbers—a common technology at that time—language in the statute indicates that equipment that made automatic calls from lists of recipients was also covered by the *TCPA*.

This conclusion is supported by **[*24]** provisions in the *TCPA* allowing an ATDS to call selected numbers. For instance, the *TCPA* permitted use of autodialers for a call "made with the prior express consent of the called party." *47 U.S.C. § 227(b)(1)(A) (1991)*. To take advantage of this permitted use, an autodialer would have to dial from a list of phone numbers of persons who had consented to such calls, rather than merely dialing a block of random or sequential numbers.[7]

---

[6] Our statement in *Satterfield* that "the statutory text is clear and unambiguous" referred to only one aspect of the text: whether a device had the "*capacity* 'to store or produce telephone numbers . . . .'" *569 F.3d at 951* (emphasis in original).

[7] Other provisions in the statute prohibited calls to specified numbers. For instance, the statute authorized the FCC to establish and use a national database "to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations" and who could not be called by telemarketers. *Id. § 227(c)(3)*. It likewise prohibited calls to emergency telephone lines, *id. § 227(b)(1)(A)(i)*, patient rooms in hospitals or other health care facilities, *id. § 227(b)(1)(A)(ii)*, and paging services and cellular phones, *id. § 227(b)(1)(A)(iii)*. In order to comply with such restrictions, an ATDS could either dial a list of permitted numbers (as allowed for autodialed calls made with the prior express consent of the called party) or block prohibited numbers when calling a sequence of random or sequential numbers. In either case, these provisions indicate Congress's understanding that an ATDS was not

Congress's 2015 amendment to the *TCPA* provides additional information about Congress's views on the scope of the definition of ATDS. After the FCC issued its 2015 order, Congress added language to *§ 227(b)(1)(A)(iii)*, exempting the use of an ATDS to make calls "solely to collect a debt owed to or guaranteed by the United States." *Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 588* (codified at *47 U.S.C. § 227(b)(1)(A)(iii)*). Like the exception allowing the use of an autodialer to make calls "with the prior express consent of the called party," this debt collection exception demonstrates that equipment that dials from a list of individuals who owe a debt to the United States is still an ATDS but is exempted from the *TCPA*'s strictures. Moreover, in amending this section, Congress left the definition of ATDS untouched, even though the FCC's prior [*25] orders interpreted this definition to include devices that could dial numbers from a stored list. We "presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation." *Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist., 307 F.3d 1064, 1072 (9th Cir. 2002)*. Because we infer that Congress was aware of the existing definition of ATDS, its decision not to amend the statutory definition of ATDS to overrule the FCC's interpretation suggests Congress gave the interpretation its tacit approval. See *Lorillard v. Pons, 434 U.S. 575, 580, 98 S. Ct. 866, 55 L. Ed. 2d 40 (1978)* ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

*HN8*[⬆] Despite the ambiguity of the statutory definition of ATDS, reading the definition "in [its] context and with a view to [its] place in the overall statutory scheme," *Brown & Williamson Tobacco Corp., 529 U.S. at 133*, we conclude that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a "random or sequential number generator," but also includes devices with the capacity to dial stored numbers automatically. Accordingly, we read *§ 227(a)(1)* to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to [*26] store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers.[8]

*HN9*[⬆] We also reject *Crunch*'s argument that a device cannot qualify as an ATDS unless it is fully automatic, meaning that it must operate without any human intervention whatsoever. By referring to the relevant device as an "*automatic* telephone *dialing* system," Congress made clear that it was targeting equipment that could engage in automatic *dialing*, rather than equipment that operated without any human oversight or control. *47 U.S.C. § 227(a)(1)* (emphasis added); *see ACA Int'l, 885 F.3d at 703* ("'[A]uto' in autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing system,' *47 U.S.C. § 227(a)(1)*—would seem to envision non-manual dialing of telephone numbers."). Common sense indicates that human intervention of some sort is required before an autodialer can begin making calls, whether turning on the machine or initiating its functions. Congress was clearly aware that, at the very least, a human has to flip the switch on an ATDS. See *The Automated Telephone Consumer Protection Act of 1991, Hearing Before the Subcomm. on Commc'ns of the Comm. on Commerce, Sci., and Transp.*, 102nd Cong. 15 (1991) [*27] (statement of Robert Bulmash, President, Private Citizen, Inc.) (describing a pitch for autodialers in a telemarketing magazine as stating: "You come home from work[, and] turn on the machine, just like turning on a radio."). *Crunch* does not dispute that the Textmunication system dials numbers automatically, and therefore it has the automatic dialing function necessary to qualify as an ATDS, even though humans, rather than machines, are needed to add phone numbers to the Textmunication platform.

**D**

Because we read *§ 227(a)(1)* to provide that the term

_____

assumption that a device must be able to generate random or sequential numbers in order to qualify as an ATDS. *Dominguez ex rel. Himself v. Yahoo, Inc., 894 F.3d 116, 120 (3d Cir. 2018)* (stating, without explanation, that the plaintiff's claims against Yahoo failed because he "cannot point to any evidence that creates a genuine dispute of fact as to whether [Yahoo's device] had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers"). In making this assumption, the Third Circuit failed to resolve the linguistic problem it identified in an unpublished opinion in the same case, where it acknowledged that "it is unclear how a number can be *stored* (as opposed to *produced*) using 'a random or sequential number generator.'" *Dominguez v. Yahoo, Inc., 629 F. App'x 369, 372 n.1 (3d Cir. 2015)*. Because the Third Circuit merely avoided the interpretive questions raised by the statutory definition of ATDS, its published opinion is unpersuasive.

_____

limited to dialing wholly random or sequential blocks of numbers, but could be configured to dial a curated list.

[8] Therefore, we decline to follow the Third Circuit's unreasoned

2018 U.S. App. LEXIS 26883, *27

"automatic telephone dialing system" means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person), we conclude there is a genuine issue of material fact as to whether the Textmunication system is an ATDS. The evidence in the record shows that the Textmunication system stores numbers and dials them automatically to send text messages to a stored list of phone numbers as part of scheduled campaigns. This is sufficient to survive summary judgment.[9] Because **[*28]** the district court did not have the benefit of *ACA International* or our construction of the definition of ATDS, we vacate the district court's ruling and remand it for further proceedings.[10] Each party shall bear its own costs on appeal.

**VACATED AND REMANDED.**

---

End of Document

---

[9] Because we vacate the district court's decision on this ground, we decline the reach the question whether the device needs to have the current capacity to perform the required functions or just the potential capacity to do so. Cf. **Meyer v. Portfolio Recovery Assocs. LLC, 707 F.3d 1036, 1043 (9th Cir. 2012)**; <u>Satterfield, 569 F.3d at 951</u>.

[10] We also vacate the district court's dismissal of **<u>Crunch</u>**'s motion to exclude Hansen's declaration as moot. The district court based its ruling on its conclusion that there was no dispute of material fact as to whether the Textmunication system was an ATDS, and Hansen's declaration could not help create one. To the extent Hansen's declaration addresses whether the Textmunication system calls automatically from a stored list, it is relevant to the question whether the system qualifies as an ATDS.

We **DENY** Marks's motion for judicial notice of two newspaper articles. We "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." <u>Fed. R. Evid. 201(b)</u>. Because Marks has not pointed to any judicially noticeable facts in these articles, we decline to take judicial notice.

Anton Ewing

# Exhibit E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

JAMES EVERETT SHELTON,      :    CIVIL CASE
                            :
        Plaintiff(s)        :    Case No.  2:18-cv-02071
                            :
   v.                       :    Philadelphia, Pennsylvania
                            :    May 1, 2019
FAST ADVANCE FUNDING, LLC   :    Time 9:15 a.m. to 9:59 p.m.
                            :
        Defendant(s),       :
. . . . . . . . . . . . .

TRANSCRIPT OF HEARING AND ORAL ARGUMENTS
BEFORE THE HONORABLE CHAD F. KENNEY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          Bryan Anthony Reo, Esq.
                            Reo Law LLC
                            PO Box 5100
                            Mentor, OH 44061

For Defendant:              John P. Hartley, Esq.
                            Complete Business Solutions Group
                            20 N. 3rd Street
                            Philadelphia, PA 19106

Court Recorder:             Christopher Kurek
                            Clerk's Office
                            U.S. District Court

Transcription Service:      Precise Transcripts
                            45 N. Broad Street
                            Ridgewood, NJ 07450

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1          MR. HARTLEY:  I do agree with you Your Honor.

2          THE COURT:  Right.

3          MR. HARTLEY:  It's just that --

4          THE COURT:  So, where were you asking for

5     discovery on that issue all along, where was your client

6     all along to participate in this case?  That's a question

7     you have to ask your client, I wondered all along where

8     your client was in this case.  Now they want to raise a

9     legal issue that requires some discovery, requires to ask

10    for discovery, now you come in and say, Judge it's, it's a

11    -- I want, I want my record, you had all this time to

12    create your record and make this argument, all this time

13    for me to, potentially, to decide this on summary

14    judgment, to go through all the, to go through all the law

15    and to make a decision, and now you don't have your

16    record.  And, that's not on me, that's not on the Court,

17    that's on your client.  And, I could see the attitude of

18    your client through your attorney in the Rule 16, that I'm

19    not going to just -- I'm, I'm -- we're not doing anything

20    with this because we don't believe in their case and it

21    looked as if they were like, because they're serial

22    litigant.  Well, the only way this, this act is going to

23    get any teeth in it at all is through a serial litigant.

24    So, I just don't understand why your, your client took

25    that approach and it's interesting to me from a visual

CERTIFICATE

I, Stephanie Garcia, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

May 10, 2019

# Exhibit F

## Back to usage

## Data, text & talk logs

**Device:**   Anton Ewing   |   619.719.9640

**Billing period:**   Jun 10, 2019 - Present
Showing details for Talk usage

View details by:   Talk

| | Totals for this billing period: | 230 calls | 954 minutes | $0.00 |
|---|---|---|---|---|

| Date / Time | Contact | Location | Call Type | Minutes | Charge ($) |
|---|---|---|---|---|---|
| 06/21/2019 10:05AM | ▬▬▬▬ | Toll Free | DT | 2 | 0.00 |
| 06/21/2019 09:21AM | 619.719.2680 | INCOMING | DT | 1 | 0.00 |
| 06/21/2019 09:05AM | 208.215.2537 | COEURDALEN | DT | 1 | 0.00 |
| 06/21/2019 07:07AM | 619.719.7862 | INCOMING | DT | 1 | 0.00 |
| 06/21/2019 06:33AM | ▬▬▬▬ | INCOMING | DT | 7 | 0.00 |
| 06/20/2019 08:37PM | ▬▬▬▬ | INCOMING | DT | 27 | 0.00 |
| 06/20/2019 06:42PM | ▬▬▬▬ | INCOMING | DT | 7 | 0.00 |
| 06/20/2019 05:57PM | 858.880.2447 | SNDG MRMS | DT | 1 | 0.00 |
| 06/20/2019 05:01PM | 888.980.8227 | INCOMING | DT | 8 | 0.00 |

| Date / Time | Contact | Location | Call Type | Minutes | Charge ($) |
|---|---|---|---|---|---|
| 06/20/2019 03:50PM | 619.310.0069 | INCOMING | DT | 1 | 0.00 |
| 06/20/2019 03:20PM | 888.980.8227 | INCOMING | DT | 4 | 0.00 |
| 06/20/2019 02:59PM | 619.925.1040 | INCOMING | DT | 2 | 0.00 |
| 06/20/2019 02:29PM | 619.952.8517 | INCOMING | DT | 20 | 0.00 |
| 06/20/2019 02:12PM | 619.933.3846 | INCOMING | DT | 14 | 0.00 |
| 06/20/2019 01:40PM | 619.310.0069 | INCOMING | DT | 7 | 0.00 |
| 06/20/2019 01:33PM | 205.224.4466 | INCOMING | DT | 3 | 0.00 |
| 06/20/2019 12:58PM | 631.201.0703 | INCOMING | DT | 1 | 0.00 |
| 06/20/2019 12:52PM | 877.386.3464 | INCOMING | DT | 1 | 0.00 |
| 06/20/2019 12:51PM | 631.636.3976 | INCOMING | DT | 1 | 0.00 |
| 06/20/2019 12:03PM | ████████ | SNDG SNDG | DT | 1 | 0.00 |
| 06/20/2019 11:38AM | 619.719.6127 | INCOMING | DT | 1 | 0.00 |
| 06/20/2019 11:28AM | 215.408.2800 | INCOMING | DT | 5 | 0.00 |
| 06/20/2019 11:01AM | 619.310.0069 | INCOMING | DT | 8 | 0.00 |
| 06/20/2019 10:45AM | ████████ | SNDG SNDG | DT | 1 | 0.00 |
| 06/20/2019 10:45AM | 619.924.1973 | INCOMING | DT | 1 | 0.00 |
| 06/20/2019 09:44AM | ████████ | INCOMING | DT | 2 | 0.00 |
| 06/20/2019 09:36AM | ████████ | LA JOLLA | DT | 7 | 0.00 |

# Exhibit G

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9              SOUTHERN DISTRICT OF CALIFORNIA
10
11   ANTON EWING, et al.,                    Case No.: 18cv1455-LAB (JLB)
12                          Plaintiff,
                                             **FINDINGS AND ADMONITION**
13   v.                                      **TO PLAINTIFF**
14   OASIS MEDIA, LLC, et al.,
15                          Defendant.
16
17          After affording Plaintiffs Anton Ewing notice and an opportunity to be heard,
18   the Court found that although he had been repeatedly ordered to obey Civil Local
19   Rule 83.4 (concerning civility and professionalism), he repeatedly violated this rule.
20   Ewing was discourteous and unprofessional when communicating with opposing
21   parties and counsel; he disparaged their intelligence, ethics, and behavior; and he
22   acted in a manner detrimental to the proper functioning of the judicial system.
23          Although Ewing has usually proceeded *pro se*, he is a frequent litigant, and
24   represents to the Court that he has a J.D. from the University of Arizona College
25   of Law. Despite his having legal training, the Court has repeatedly had to remind
26   or order him to familiarize himself with various rules and to obey them.  He is not
27   in the same category as ordinary civil litigants whose unfamiliarity with applicable
28   rules is more excusable.  *See Doe v. City of Los Angeles*, 2013 WL 6019121, at

18cv1455-LAB (JLB)

1   *15 (C.D. Cal., Nov. 13, 2013); *Phillips v. KIRO-TV, Inc.*, 817 F. Supp. 2d 1317,

2   1323 (W.D. Wash., 2011). Although Civil Local Rule 83.4 refers to the duties of

3   attorneys, Ewing must treat it as applicable to him. He is **ORDERED** to read and

4   obey it. He is also **ORDERED** to read and obey Fed. R. Civ. P. 11.

5        Specifically, Ewing is **ORDERED** to be courteous and civil in all

6   communications with opposing counsel, parties, and third parties and to refrain

7   from disparaging their intelligence, ethics, or behavior. This includes making

8   accusations for improper purposes (such as to harass, delay, or embarrass) or

9   making any accusation without first confirming that it is accurate and supported by

10  evidence. *See* Fed. R. Civ. P. 11(b)(1) and (3). In filings in this Court, he is

11  **ORDERED** not to attach or quote from private correspondence or other private

12  communications (including letters, emails, texts, or phone calls) between himself

13  and other parties or counsel, except as specifically authorized under applicable

14  rules or laws, or permitted by judicial officers of the Court. He is **ORDERED** to

15  refrain from making misrepresentations to opposing counsel or parties.

16       Several documents Ewing provided to the Court showed that he misleadingly

17  used the designation "JD" after his name, followed by a disclaimer mentioning

18  privilege and confidentiality, and citing legal authority.[1] At the hearing, Ewing

19  represented to the Court that he had stopped using this designation and would not

20  resume doing so, and the Court takes him at his word. When communicating with

21  counsel, parties, or third parties in connection with litigation, Ewing is **ORDERED**

22

23

---

24  [1] Ewing offered the explanation that this was appropriate for his work as a tax

25  preparer. But the communications had nothing to do with tax preparation. In

    context, this was likely to mislead recipients, especially non-lawyers, into believing

26  he was a lawyer. In one particularly egregious example, he did this when

27  discussing settlement with a non-lawyer. He inaccurately said the case was over

    and had been resolved in his favor, apparently to convince his opponent to make

28  a quick payment.

2

1   not use the designation "JD" after his name or otherwise suggest that he is an
2   attorney.

3        For a period of 36 months from the date this order is issued, Ewing must file
4   a copy of this order along with any new pro se pleading he files in this District.

5
6        **IT IS SO ORDERED**.
7   Dated:  May 29, 2019
8
9                                Hon. Larry Alan Burns
10                               Chief United States District Judge
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

18cv1455-LAB (JLB)